**KINARK CORPORATION, A Delaware Corporation, Camelot Inns of America Corporation, a Delaware Corporation, and Camelot Inn-Little Rock, Inc., an Arkansas Corporation, Plaintiffs,**

v.

**CAMELOT, INC., a New Jersey Corporation, d/b/a Camelot Hotel/Casino, Defendant.**

**Civ. A. No. 81–1364.**

United States District Court,
D. New Jersey.

Sept. 14, 1982.

Charles W. Heuisler, Archer, Greiner & Read, P. C., Haddonfield, N. J. and Herbert F. Kozlov, Richard J. Zakin, Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiffs.

Patrick T. McGahn, Jr., McGahn, Friss & Gindhart, Atlantic City, N. J. and Pasquale A. Razzano, Hugh C. Barrett, Maureen C. Meinert, Curtis, Morris & Safford, P. C., New York City, for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

BROTMAN, District Judge.

This is an action for service mark infringement and unfair competition. Claims for relief are pleaded under §§ 32(1) and 43(a) of the Lanham Act of 1946, as amended (hereinafter, "the Lanham Act"), 15 U.S.C. §§ 1114(1), 1125(a), as well as under the common law. Plaintiffs claim to be the owners of two federally registered service marks, CAMELOT INN and CAMELOT, which they have used in connection with hotels in Tulsa, Oklahoma, and Little Rock, Arkansas. Defendant Camelot, Inc., has undertaken steps to build and operate the Camelot Hotel/Casino in Atlantic City, New Jersey. Defendant denies infringement and unfair competition and asserts defenses and counterclaims for cancellation of the service marks on the basis of alleged fraud in the procurement and maintenance of the plaintiffs' service marks, laches and abandonment. Defendant also asserts that it was the user of the CAMELOT mark prior to plaintiffs' registrations, that there is no likelihood of confusion among consumers as to the sources of services marketed under the CAMELOT mark, and that plaintiffs' conduct amounts to malicious prosecution, unfair competition and false representation.

A five day trial was held without a jury. Upon consideration of the testimony and

exhibits, stipulations, portions of deposition transcripts and answers to interrogatories relied on by the parties, as well as the proposed findings of fact and conclusions of law and the argument of counsel, the court is entering its findings of fact and conclusions of law below. Fed.R.Civ.P., Rule 52(a). Findings of fact which may also be considered conclusions of law are so deemed, and vice versa.

### FINDINGS OF FACT

#### I. PARTIES.

1. Plaintiff Kinark Corporation (hereinafter, "Kinark") is organized under the laws of the State of Delaware and has its principal place of business in Tulsa, Oklahoma. Kinark is a publicly owned company with over 4.3 million shares issued and outstanding. Its stock is traded on the American Stock Exchange. Kinark owns the facility now called the "Camelot Hotel" in Tulsa, Oklahoma, formerly called the "Camelot Inn." (Final Pre-Trial Order, Stipulation). Kinark had sales of about $36 million in 1980. About half of these sales were attributable to Kinark's chemical formulating, packaging and distribution business, about a quarter to its industrial and commercial construction and manufacturing, and the remaining quarter to its hotel business. (Plaintiffs' Exhibit 36).

2. Plaintiff Camelot Inns of America Corporation (hereinafter, "CIAC") is a wholly-owned subsidiary of Kinark. It is a Delaware corporation with its principal place of business in Tulsa, Oklahoma. CIAC, through its subsidiary, Camelot Inn-Little Rock, Inc., owns the facility now called the "Camelot Hotel" in Little Rock, Arkansas, formerly called the "Camelot Inn." Camelot Inn-Little Rock, Inc., is an Arkansas corporation with its principal place of business in Little Rock. (*Id.*).

3. Defendant Camelot, Inc., a New Jersey corporation, has its principal place of business in Atlantic City, New Jersey. Camelot, Inc., is a controlled subsidiary of American Leisure Corp. (Defendant's Ex. 1). American Leisure's sole business is Camelot, Inc., and the two companies maintain common offices. (Vol. V, p. 13).

#### II. PLAINTIFFS' HOTELS AND MARKETING ACTIVITIES.

4. The Camelot Hotel in Tulsa is the third largest hotel in the Tulsa area, with about 350 rooms. (Dep. of Bajdek, pp. 64, *et seq.*). The hotel provides a comprehensive range of services to its guests, including room service, laundry and dry cleaning, shoe shines and delivery of newspapers to rooms, and arranges for the operation of restaurants and stores within its premises. (Vol. I, pp. 55–56, 63; Vol. II, p. 34; Plaintiffs' Ex. 9, 14). Eighty to eighty-five thousand rooms are occupied by guests each year. (Vol. I, p. 63).

5. The decor, stationery and the promotional materials in the hotel are designed to call forth associations with the thousand year old Arthurian legends of knightly splendor, courtly valor, chivalry and romance. For example, rooms in the hotel are named after Robin Hood, Friar Tuck, Lancelot, Galahad, William Tell and Ivanhoe. The plaintiff uses Gothic lettering to set forth the CAMELOT mark on nearly all of its materials in order to strengthen the association with medieval England. The architecture of the hotel is designed toward the same end, for the entrance to the hotel is at the end of a drawbridge spanning a moat; the exterior walls of the building are capped with machicolations, crenelations, corbels, battlements and turrets. Banners and heraldic shields appear throughout. The swimming pool is in the shape of a shield, and the Excalibur sword embedded in stone appears in the lobby. (*E.g.*, Plaintiffs' Ex. 4).

6. The Camelot Hotel in Little Rock contains features with similar medieval associations, although the architecture is not so richly laden. (Plaintiffs' Ex. 5, 6). With 303 rooms, it is the largest hotel in Little Rock, with many of the same amenities as are in the Tulsa hotel. (Vol. I, pp. 58–61; Plaintiffs' Ex. 10). Seventy thousand rooms are sold each year. (Vol. I, p. 63).

7. Both of plaintiffs' Camelot Hotels have facilities which make them suitable

for conventions and meetings. (Vol. I, pp. 114–15). Such conventions have been held at both hotels (Id., pp. 115–16), and, indeed, they account for forty to forty-five percent of the plaintiffs' hotel business. (Vol. I, pp. 114–18; Dep. of Chastain, pp. 165–67). Promotional efforts to book conventions and meetings may be made solely by the plaintiffs' hotels, or by local Chambers of Commerce and like organizations. (Dep. of Bajdek, pp. 36–37). The Little Rock hotel is located next to that city's convention center, and is connected to the center by a covered walkway. (Dep. of Chastain, p. 86; Vol. I, p. 65).

8. Aside from convention and meeting business, the plaintiffs' hotels rely primarily on business travellers for income from room accommodations. The restaurants may draw from a more local clientele, but it is fair to say that both hotels draw a substantial amount of their room guests from all parts of the United States and from outside of the country. Few of the guests at either hotel stay there only as pleasure travellers. (Vol. I, p. 12; Vol. II, pp. 30–32; Deposition of Bajdek, pp. 80–86). The hotels generally have been profitable businesses in recent years (Vol. III, pp. 10–14, 35–38, 40–41), and are for sale by Kinark, which has decided to continue in industries which do not have such heavy investment in real estate. Kinark has indicated an asking price for the hotels of $26 to $32 million dollars. (Vol. II, pp. 24–27). Plaintiffs maintain that they have intended to expand their small hotel chain to other cities, but have done little to demonstrate this intention except for an ill-fated effort which will be discussed below. (Vol. I, p. 120; Finding of Fact, ¶ 32). The likelihood that future owners of the Camelot Hotels might attempt to expand the chain is impossible to ascertain.

9. The marketing expenses of plaintiffs for their two hotels from 1974 to 1981 were $3,787,000.00. The figure is based on an extremely broad definition of marketing expenses, and much of these expenses are aimed at attracting local business for the restaurants located in the hotels, or are otherwise not calculated to reach people who are outside of the Tulsa and Little Rock regions. (Vol. I, pp. 79–87; Vol. II, pp. 12–13, 35–40; Plaintiffs' Ex. 278, 279, 279A). Nevertheless, the two hotels are the subject of a significant amount of national advertising. The Little Rock Hotel was the beneficiary of advertisements placed by the American Express Co. in *Business Week* and *U. S. News & World Report* in 1981. (Vol. I, pp. 87–91; Plaintiffs' Ex. 17, 18, 18A). Ads for the hotels are placed in airline magazines and in publications used by people connected with the travel industry. (Vol. I, pp. 85–106). The plaintiffs' predecessors placed advertisements in the *Wall Street Journal,* but probably not between 1965 and 1981. (Vol. I, pp. 91–94; Plaintiffs' Ex. 20; Dep. of Bajdek, p. 29; *see also* Dep. of Chastain, pp. 97–101, 138–41, 149).

## III. DEFENDANT'S HOTEL AND MARKETING ACTIVITIES.

10. Defendant's Camelot Hotel/Casino is planned for an 8.2 acre site in the marina area of Atlantic City. (Final Pre-Trial Order, Stipulation). If the plans of the defendant come to fruition, the complex will be considerably larger than either of the plaintiffs' hotels, consisting of 990 hotel rooms and suites, a casino of sixty thousand square feet, several meeting rooms, a theatre, seven restaurants, tennis and racquet ball courts, two movie theatres, swimming pools and other entertainment, commercial and exhibition facilities. (Defendant's Ex. 1). There will be a good deal more space and facilities than in the Tulsa or Little Rock Camelots. (*E.g.,* Vol. V, pp. 13–19). Like the plaintiffs, defendant has adopted the use of many symbols of the English Middle Ages, as well as the Gothic lettering which the plaintiffs have used, and the imagery of Dark Ages military activities. (*E.g.,* Vol. I, p. 109; Vol. V, p. 19; Plaintiffs' Ex. 4, 5, 6, 8, 9, 26, 161B, 161E, 163, 164, 165, 166, 173, 182, 183).

11. Nathan S. Jacobson, one of the founders of defendant Camelot, Inc., has had many years of experience in the planning, construction, and operation of hotel and casino complexes. For example, Mr.

Jacobson was instrumental in the construction and operation of Caesar's Palace in Las Vegas, Nevada, and Kings Castle in Incline Village, Nevada, near Lake Tahoe. In addition, he has been associated with such other hotel/casinos as the Bonanza and Circus, Circus in Las Vegas. (Vol. V, pp. 8–9). The Kings Castle Hotel/Casino near Lake Tahoe operated by Mr. Jacobson was constructed on a medieval theme and included a number of facilities having names related to the Dark Ages, including a Camelot Room Theatre within the hotel complex. (Defendant's Ex. 8).

12. Construction of the hotel has been partially financed (Vol. III, pp. 69–73), and defendant estimates that it has spent more than $144,000.00 to promote the Camelot Hotel/Casino. This is a conservative estimate, and it is more likely that $200,000.00 has been spent to date. (Vol. III, p. 55). A consultant for the defendant has estimated that $5 million will be spent on promotion in the first year of the hotel's operation, although most of this money will be spent for the purpose of generating publicity rather than for buying paid advertisements. (Vol. III, pp. 82–93). It is conceded by defendant that this estimate of $5 million will likely turn out to be lower than actual costs incurred. (Vol. III, p. 108; Dep. of Kuhlmann, pp. 19–20, 60). Like plaintiffs, defendant will draw about half of its hotel business from conventions and meetings; unlike plaintiffs, defendant will draw the rest of its hotel business not from business travellers but from pleasure and vacation travellers. (Vol. III, pp. 109, 135; Dep. of Kuhlmann, pp. 59–60).

13. As part of defendant's advertising campaign, television personality Merv Griffin has been named a director of defendant Camelot, Inc. He will be involved in promotion of the hotel/casino. (Final Pre-Trial Order, Stipulations; Vol. III, p. 51). Griffin will broadcast his nationally-syndicated television talk show from the Camelot Hotel/Casino for six to eight weeks per year. The affiliation between Camelot, Inc., and Griffin was reported in more than twenty newspapers across the country and on a television news show in Los Angeles.

(Plaintiffs' Ex. 198; Final Pre-Trial Order, Stipulations; Vol. III, p. 52). It is evident that defendant's use of the mark CAMELOT is already extensive and nationwide, and will become more prominent and extensive when the hotel/casino opens.

IV. THE ORIGIN OF PLAINTIFFS' SERVICE MARK REGISTRATIONS.

A. Number 829,257—CAMELOT INN

14. On May 23, 1967, the Patent Office issued Registration No. 829,257 to Ainslie Perrault for the service mark CAMELOT INN in connection with "Motels, Hotels and Restaurant Services." (Plaintiffs' Ex. 1). The term INN was disclaimed apart from the mark as a whole. The events preceding this registration are set forth below. (Findings of Fact, ¶¶ 15–24).

15. In the fall of 1965, Ainslie Perrault opened the Camelot Inn Motor Hotel on the outskirts of Tulsa. (Plaintiffs' Ex. 259).

More than a year earlier, on August 4, 1964, Perrault's trademark counsel, Paul Johnson, asked the Trademark Service Corporation of New York to run a search on the service mark CAMELOT INN. (Defendant's Ex. 58). The search report, dated August 12, 1964, (Id.), showed that the name CAMELOT had been the subject of many registrations on a variety of products and services, having been used in the name of a Camelot Bar in Philadelphia, a Camelot Inn in Detroit, Michigan, a Camelot Terrace Caterers, Inc., in Brooklyn, New York, and a Camelot Coffee Show in New York, New York. Johnson reported to Perrault on August 14, 1964, that he had conducted this search and had contacted the Camelot in Detroit and had determined that the facility was a restaurant. Johnson's report (Defendant's Ex. 77) does not indicate whether or not Johnson had contacted the other Camelot facilities in Philadelphia, Brooklyn or New York City. Johnson advised Perrault to wait until another Camelot Inn was established in another state before filing an application to register the service mark in the Patent Office. Johnson also advised Perrault that there might be "some conflict

if you install one of your facilities in Detroit, or in the immediate vicinity due to the restaurant which already bears this name...."

16. In spite of this advice, on October 26, 1964, Perrault filed his application (Serial No. 204,731) to register the name CAMELOT INN with the Patent Office without establishing a Camelot Inn in another state. The application was filed on behalf of Mr. Perrault by his attorney, Paul H. Johnson. (Defendant's Ex. 31). Perrault's application bears a sworn statement that the mark CAMELOT INN "was first used on August 4, 1964, was first used in interstate commerce on August 4, 1964; and is now in use in such commerce." Perrault's application also states that he had "adopted and is using this service mark ... for motels, hotels and restaurant services."

17. The August 4, 1964, date referred to above is the date of Johnson's letter requesting the search; on that date the Camelot Inn Motor Hotel was neither built nor in operation. Thus, Perrault was not performing any services on either August 4, 1964, or on the date he filed his application. (Vol. II, p. 8; Defendant's Ex. 83).

18. According to the Patent Office file history for this application, neither Perrault nor his counsel informed the Patent Office about the Camelot Inn restaurant in Detroit, Michigan, the Camelot Bar or the Camelot Coffee Shop, despite the fact that Perrault claimed rights in the use of CAMELOT INN in connection with restaurant services, and despite Johnson's advice that there "may be some conflict" with the Camelot Inn restaurant in Detroit. Indeed, Perrault stated in his application that

> to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in near resemblance thereto as might be calculated to deceive. (Defendant's Ex. 31).

19. On July 1, 1965, after Perrault filed his service mark application, the attorney for the Camelot Motor Lodge and Inn Corporation of Palm Beach, Florida, wrote to Perrault and complained about his use of the name CAMELOT INN, explaining that

the Camelot Motor Lodge and Inn Corporation had been formed three years earlier to develop a "system of Camelot motels throughout the United States." (Defendant's Ex. 59a). On July 9, 1965, Mr. Johnson replied to this letter, referring to his earlier search and to the "new facility soon to be completed in Tulsa." (Defendant's Ex. 59b). Counsel for Camelot Motor Lodge and Inn Corp. wrote Mr. Johnson on July 12, 1965, again claiming prior use of the word CAMELOT. (Defendant's Ex. 59c).

20. On December 7, 1965, the Patent Office issued federal service mark Registration No. 800,011 to the Camelot Motor Lodge and Inn Corp. of Palm Beach for the name CAMELOT for use in connection with motel and restaurant services. (Defendant's Ex. 7). That registration is based on a date of first use of December 19, 1963, and first use in commerce of January 4, 1965— prior to the dates of actual operation of a Camelot Hotel by Perrault. Defendant has attempted to obtain the file history of this registration but because of the lack of any subsequent activity related to the registration, the Patent Office has destroyed the file. (Defendant's Ex. 111). Of course, there is no way of knowing if the statements pertaining to Registration No. 800,-011 made by the Palm Beach corporation are true.

21. On February 21, 1967, the Camelot Motor Lodge and Inn Corp. filed an opposition in the Patent Office to registration of Perrault's service mark, CAMELOT INN, based on its own Registration No. 800,011. The opposition proceeded no further than filing, however, because the opposer failed to pay the necessary fee to the Patent Office. (Defendant's Ex. 31, pp. 59–62).

22. On July 29, 1965, the Patent Office issued an Official Action in which inquiry was made "as to the basis for applicant's claim that the services are rendered in interstate commerce." Johnson responded to that Official Action on August 25, 1965, (Defendant's Ex. 31, pp. 6–8), and submitted a *Wall Street Journal* advertisement dated August 17, 1965. (Plaintiffs' Ex. 250). Johnson did not advise the Patent Office Examiner: (1) that the hotel was

not in operation as of the date of the filing of the application; (2) that the hotel was not then in operation; (3) that Camelot Motor Lodge and Inn Corporation claimed prior rights in the name; or (4) that there existed a Camelot Inn restaurant in Detroit, Michigan, and other Camelots in Philadelphia, Brooklyn and New York City.

23. In response, the Examiner, on May 24, 1966, (Defendant's Ex. 31, p. 9), pointed out that advertising material sent across state lines is irrelevant to the question of use in interstate commerce, since "it is the *service* that must be rendered in interstate commerce." (Emphasis in original).

24. In answer to the May 24, 1966, Official Action, on August 30, 1966, Johnson submitted proof of actual conduct of the services in interstate commence, all occurring in 1966. In spite of the Examiner's specific inquiry, Johnson failed to advise the Examiner that the hotel had not been in operation on the alleged dates of first use or on the filing date of the application. Although Johnson had written only four days earlier to counsel for Camelot Motor Lodge and Inn Corporation (Defendant's Ex. 59), he again failed to advise the Examiner of the claims of that corporation.

25. In 1968 Kinark (then called Kin-Ark Oil Corporation) purchased the Camelot Inn in Tulsa, Oklahoma, from Perrault. Registration No. 829,257 was assigned to Kinark. (Plaintiffs' Ex. 3).

### B. Number 914,504—CAMELOT

26. On June 8, 1971, the Patent Office issued Registration No. 914,504 to Kinark for the service mark CAMELOT in connection with "Motels, Hotels, and Restaurant Services." The events preceding the issuance of the registration are as follows.

27. On December 22, 1969, Kinark filed an application (Serial No. 346,911) in the Patent Office to register the service mark CAMELOT for "Motel, Hotel and Restaurant Services," alleging first use on August 4, 1964. (Defendant's Ex. 32). The application was filed for Kinark by Paul Johnson, who again failed to advise the Patent Office that the hotel was not in existence on August 4, 1964.

28. Although both Kinark's counsel, Mr. Johnson, and the Kinark official who signed this application, Don Laden, were aware of the existence of the Camelot Motor Lodge and Inn Corporation and its claim to prior rights in the name CAMELOT, neither Kinark nor its counsel ever told the Patent Office about these matters. (Dep. of Laden, pp. 12, 13; Defendant's Ex. 32, p. 38; Defendant's Ex. 59, letter of April 30, 1969). The application never revealed that neither Kinark nor Perrault had ever operated a Camelot Restaurant, nor was there any disclosure of the existence of a Camelot Inn motel in Winfield, Kansas, of which Kinark became aware in May of 1971. (Defendant's Ex. 62).

### C. Maintenance of the Registrations

29. On June 14, 1972, Abe Hesser, then vice president of Kinark, executed a declaration indicating five continuous years of use of the mark CAMELOT INN as provided for by §§ 8 and 15 of the Lanham Act. 15 U.S.C. §§ 1058(a), 1058(b), 1065. The declaration was submitted to the Patent Office in order to maintain in effect Kinark's service mark registrations. (Defendant's Ex. 31). Hesser told the Patent Office that the mark had been in "continuous use in interstate commerce for five consecutive years from May 23, 1967, to the present, on goods recited in the registration, to wit: Motels, Hotels and Restaurant services."

30. Hesser's declaration further stated that Kinark was the owner of Registration No. 829,257. Because that registration had been assigned to CIAC on February 18, 1972, almost four months earlier, Hesser's statement was also inaccurate in this regard. (Defendant's Ex. 67, 91).

31. On March 31, 1977, Paul R. Chastain, vice president of CIAC, filed a similar declaration concerning the service mark CAMELOT. (Defendant's Ex. 32).

### V. PLAINTIFFS' GRANT OF A LICENSE FOR THE USE OF THEIR SERVICE MARKS.

32. In 1972, Abe Hesser constructed and operated a Camelot Inn Motel in Amarillo,

Texas. (Dep. of Hesser, pp. 19–20). Kinark was aware of Hesser's construction of the hotel and the use of the name CAMELOT INN. (Defendant's Ex. 66). There was an intent to enter a franchise agreement with Kinark, though none was ever executed. (Dep. of Chastain, p. 125). Kinark did exercise some degree of control over the quality of the services provided by Hesser. (Dep. of Hesser, pp. 10–14; Dep. of Chastain, pp. 125–26). Hesser's motor hotel in Amarillo was in operation for only a few months before Hesser sold it, at which time the CAMELOT name was removed from the facility. (Dep. of Hesser, pp. 18–24).

## VI. THE ORIGIN OF DEFENDANT'S USE OF THE NAME CAMELOT.

33. Planning for the Camelot Hotel/Casino in Atlantic City began as early as 1978. (Defendant's Ex. 1).

34. At the time that Mr. Jacobson selected the name Camelot Hotel/Casino for the establishment, he had no actual knowledge of the existence of Kinark or its Camelot Inns in Tulsa or Little Rock. (Vol. V, p. 54). Kinark's registrations of the marks provided constructive notice of its ownership of the marks. 15 U.S.C. § 1072.

35. Defendant has had actual notice of plaintiffs' claims to the service mark CAMELOT since July, 1980, when Kinark sent a letter to defendant informing Nathan Jacobson of these claims. (Vol. I, pp. 67–68; Plaintiffs' Ex. 30). Defendant conducted a trademark search of its own in August, 1980, which verified Kinark's federal registrations. (Vol. V, pp. 77–78; Plaintiffs' Ex. 101).

36. After defendant selected the name CAMELOT for its hotel/casino, its counsel properly sought to register the name on the hotel name register of the State of New Jersey. When the application for registration was filed, it was refused in view of Wil-Len Corporation's prior registration of the name. (Defendant's Ex. 19, 20; Vol. V,

pp. 42, 43). The Wil-Len Corp. operated a Camelot Motel in Atlantic City from 1962 until 1969, when it was condemned by public authorities exercising their power of eminent domain. (Vol. I, pp. 24–25; Defendant's Ex. 15). There was no use by Wil-Len Corp. of the CAMELOT name from 1969 until Wil-Len Corp. assigned the rights to use the name to defendant in 1979. (Vol. I, pp. 24–26; Defendant's Ex. 16, 21, 46).

## VII. THE USE OF THE NAME CAMELOT BY THIRD PARTIES FOR MOTELS, HOTELS AND RESTAURANTS; PLAINTIFFS' EFFORTS TO PREVENT SUCH USE.

37. Beginning at a time prior to Perrault's conception and planning for the Camelot Inn in Tulsa up to the present, there have been in existence in virtually every state in the United States a variety of motels, hotels and restaurants bearing the name CAMELOT. Most of these establishments are smaller than the hotels immediately involved in this litigation. (Defendant's Ex. 15, 76, 94A, 94B).

38. One of defendant's witnesses testified that he is currently the owner and operator of a Camelot Inn in Jasper, Indiana, which has been in existence since 1965. (Vol. II, pp. 180–93). Mr. Jacobson testified as to the existence of a nationally advertised Camelot restaurant operated in the Resorts International Casino in Atlantic City, and a Camelot Lounge in the Aladdin Casino in Las Vegas. (Vol. V, pp. 55–56).

39. Two additional witnesses for defendant spent several weeks combing the nation in search of other establishments bearing the name CAMELOT, and appeared to have had no trouble finding such places. The court became aware of Camelot apartment houses, hotels, and even an Italian restaurant as a result of the testimony of these witnesses, and is satisfied that an awesome number of motels, hotels and restaurants bearing the name CAMELOT exists today, have existed since well before 1965, and will continue to exist into the future. (Defendant's Ex. 63, 64, 76, 87, 88, 89).

40. Kinark has occasionally demanded that persons infringing upon its CAMELOT

service mark cease and desist. (Vol. IV, 146–47; Plaintiffs' Ex. 112, 113, 117, 119, 120, 120A, 124, 125, 127, 127A, 128, 128A, 132, 133, 135, 136, 137, 138, 141, 142). Kinark has on three occasions successfully invoked federal court litigation or opposition proceedings in the Patent Office to redress infringement on its service marks. (Vol. IV, pp. 144–48, 163; Plaintiffs' Ex. 109, 110, 111, 299). At the same time, plaintiffs have been aware of many other uses of the mark, and have considered these commercially insignificant. They have made little or no effort to prevent continued use in such cases. Their efforts to find and eliminate other users of the name CAMELOT in connection with transient lodgings have been sporadic and unsystematic. (Vol. IV, pp. 119–27, 146–53; Vol. V, pp. 105–15). Indeed, a good deal of plaintiffs' activities in this vein were initiated in anticipation of this litigation. (Vol. V, p. 124; Plaintiffs' Ex. 120, 124, 127, 128, 132, 135, 137, 142; Defendant's Ex. 62, 115C, 116B, 117C, 118).

## VIII. DEFENDANT'S LACHES CLAIM IS WITHOUT MERIT.

41. Defendant raised in its answer the defense of laches but did not press this defense at trial. It is not disputed that during the nine month interval between Kinark learning of defendant's Camelot Hotel/Casino and the commencement of this action the parties were actively corresponding and talking by telephone in an attempt to work out a negotiated resolution to this matter. (Defendant's Ex. 99A–H). Jacobson conceded there was no prejudicial delay in Kinark's initiating this action:

> There was no delay. I was under negotiations with the people. They were corresponding. I was speaking to them on the telephone. I was writing to them.

(Dep. of Jacobson, p. 205).

## IX. SIMILARITIES OF THE PARTIES' ADVERTISING AND MARKETING ACTIVITIES.

42. On several occasions articles or advertisements concerning plaintiffs' Camelot Hotels have appeared in the same issues of publications featuring articles or advertise-

ments for defendant's Camelot Hotel/Casino. (Vol. I, pp. 98–100, 108–09; Plaintiffs' Ex. 26, 300, 302). In some publications, which compile alphabetical listings of advertisers, the parties' Camelot Hotels are listed in close proximity. Plaintiffs and defendant also belong to several of the same hotel or professional meeting planners trade associations. (Dep. of Bajdek, pp. 55–57; Dep. of Kuhlmann, pp. 65–67). On at least one occasion, at a trade convention, representatives of the parties' respective Camelot Hotels solicited business at the same meeting. (Vol. III, 28–30).

43. Defendant claims it has a policy of never using the CAMELOT mark without also indicating that the Camelot Hotel/Casino is affiliated with American Leisure Corp. However, the court has seen numerous advertisements for the Camelot Hotel/Casino which make no reference to American Leisure Corp. (Plaintiffs' Ex. 27, 163, 166, 169, 176, 180). In addition, the majority of newspaper and magazine articles concerning defendant's Camelot Hotel/Casino fail to identify any corporate affiliation. (E.g., Plaintiffs' Ex. 194, 197, 201). Defendant's efforts to identify American Leisure Corp. as the source of Camelot Hotel/Casino services are incomplete—even more so than plaintiffs' unimpressive efforts to change the public designation of their hotels from "Camelot Inn" to "Camelot Hotel" (Vol. III, pp. 104–05, 111–28)—and are not sufficient to control mention of defendant's hotels by third parties. (See Vol. I, pp. 58–59, 137–38; Vol. II, pp. 15–16). Even if defendant's efforts were successful, they would have no bearing on this case. Consumers viewing defendant's printed advertisements are drawn to the rendition of the term CAMELOT because it is the most dominant visual element in the advertisement, and the part most likely to make an impression on consumers. (Vol. II, p. 167).

## X. EVIDENCE ON THE LIKELIHOOD OF CONFUSION AMONG CONSUMERS OF HOTEL SERVICES.

### A. *Actual confusion*

44. Plaintiffs have received two letters from stockholders inquiring about an associ-

ation between the planned Camelot Hotel/Casino and plaintiffs' establishments. (Vol. I, pp. 73–79; Plaintiffs' Ex. 33–35). One of the letters was commissioned by Kinark after it received a phone call from the stockholder. (Vol. II, pp. 17–20; Dep. of Walker, pp. 18–19). These letters raise a question, but do not indicate that the persons actually believed that the hotel/casino in Atlantic City was being built by plaintiffs. Moreover, since they are from stockholders, they do not necessarily represent instances of confusion in the minds of consumers of hotel services. One of the authors of these letters has sold her stock in Kinark, but the reasons for the sale are not likely related to any confusion about the ownership of the Camelot Hotel/Casino.

### B. *Defendant's conduct in anticipation of confusion*

45. On November 17, 1980, and May 28, 1981, David Smart of David A. Smart Associates, a convention planning organization, wrote letters to Robert Kuhlmann, vice president of Camelot, Inc., proposing that Smart represent the Camelot Hotel/Casino in Atlantic City. At that time, Smart also represented plaintiffs' hotels in Tulsa and Little Rock. Kuhlmann wrote to Smart in August of 1981 rejecting the offer. Among the reasons for this decision was the recognition that representation of plaintiffs and defendant by Smart might cause confusion among persons solicited by him. (Vol. III, pp. 66, 142–46; Dep. of Jacobson, p. 67; Plaintiffs' Ex. 151).

### C. *Survey Evidence on Likelihood of Confusion*

46. A great deal of plaintiffs' evidence concerned a survey undertaken by Legal Marketing Research, Inc., of Evanston, Illinois (hereinafter, "LMR"). The stated objective of the survey was to determine whether a "likelihood of confusion" existed among consumers. (Plaintiffs' Ex. 43; Vol. II, p. 48). It was not offered to prove any secondary meaning in the term CAMELOT, and is not considered for that purpose. LMR conducted the survey in Washington,

D.C., Oklahoma City, Memphis, Tennessee, and Dallas, Texas. The latter three cities are the largest sources of guests (outside of Tulsa and Little Rock) for plaintiffs' hotels. (Plaintiffs' Ex. 282–86).

47. The marketing expert who conducted plaintiffs' survey has had extensive marketing experience and has been involved with hundreds of marketing research projects in his career. (Vol. II, p. 45). By virtue of his experience in this field, the court accepts his testimony and work product as that of a person qualified to conduct and report on the results of a survey.

48. In each of the cities where the survey was conducted, about fifty people who had stayed at one or both of plaintiffs' hotels within the previous year or so were contacted at their homes. No screening was done to determine how many times each respondent had stayed at plaintiffs' hotels or the relative familiarity of the respondents with the hotels. (Vol. II, pp. 71, 86).

49. The respondents were shown color photocopies of Polaroid pictures of defendant's two billboards. (Vol. II, p. 102). Important features of the billboards were not clearly legible by the respondents. (Vol. II, pp. 103–05).

50. After showing the respondent the photographs of the billboards, the interviewer took the photographs back and asked, "Where would you expect the hotel you have just seen to be located?" Although the question may have implied that the respondent had been shown something representing an existing hotel (The billboards' words "proposed" are illegible on the specimens.), only 14.6% of the respondents identified Tulsa and 17.6% identified Little Rock. Twenty-one percent answered that they expected the hotel to be located in Atlantic City.

51. Respondents who did not answer "Tulsa" or "Little Rock" were asked further questions, apparently intended to unearth any "perceived connection" (Vol. II, p. 54) with any other hotel. These respondents were never told that the facility shown in the billboard was a hotel/casino,

or that it was to be located in Atlantic City. (Vol. II, p. 103). Based on the answers to one or more of several questions on the matter, an uncritical analysis of the survey results can permit the conclusion that the survey showed that more than seventy-eight percent of those interviewed were confused to some extent as to whether there was common sponsorship of the parties' hotel services. (Vol. II, pp. 155–56; Plaintiffs' Ex. 43, 44).

### D. *Purchasers of Hotel Services*

52. When large group bookings and conventions are arranged, individuals responsible for making such arrangements or the organizations for which they work typically select a city or location at which to have their meeting or convention, and then select the establishment. (Vol. IV, p. 161; Dep. of Bajdek, pp. 95–96). They vary the selected city from year to year. Thus, plaintiffs' competition for a given convention in any single year consists of other hotels in Tulsa or Little Rock, not hotels in Atlantic City. Individual travellers, likewise, seldom or never make travel plans with the goal of being able to stay in a particular hotel. They choose their destinations and itineraries before selecting accommodations.

53. Individuals who arrange conventions and meetings are highly sophisticated and discriminatory in selecting sites and hotels for their group meetings. (Vol. III, pp. 160, 165). Usually it is the city or region which is selected first and then a hotel or hotels. Such selections are usually made years in advance of a scheduled meeting. (Vol. III, p. 162). The practice is typically to visit the hotel before the convention is booked. (Vol. III, pp. 162–65). Such purchasers would not often be confused as to the source or relationship between hotels in different states (Vol. III, p. 170), and rarely are interested in the ownership of the hotels in which they book rooms and services.

54. Given the vast number of hotels, motels and restaurants throughout the United States, it is not uncommon to find that hotels, motels and restaurants of diverse ownership, but using the same name, exist in numerous cities throughout the United States. (Vol. III, p. 167; Vol. IV, pp. 66–69; Defendant's Ex. 53, 86, 87, 88, 89).

55. Defendant's Hotel/Casino is presently marketed to group meeting planners and convention planners. (Vol. IV, p. 54). Future advertising and marketing will no doubt be aimed at the vacationing public as well, which makes lodging choices with the aid of travel agents or by itself.

### XI. PLAINTIFFS' CONDUCT RELATED TO THE INITIATION OF THIS LITIGATION

56. On May 5, 1981, plaintiffs filed this action. Upon filing of the suit, Kinark issued a press release (Vol. IV, p. 103; Defendant's Ex. 33) which stated that "widespread adverse publicity linking the CAMELOT name with SEC fraud charges regarding securities involving this New Jersey corporation brought the matter to Kinark's attention." The statement was false, for the plaintiffs had become aware of defendant's use of the name before the Securities and Exchange Commission filed any complaints against the defendant. (Vol. V, p. 57). The SEC did file a complaint against the defendant. The action was settled and considerable publicity resulted from the filing of the complaint and the settlement of the action. (Vol. I, p. 66; Vol. V, pp. 57–60; Plaintiffs' Ex. 187, 188, 192, 202, 208, 213, 216).

57. Plaintiffs have not issued press releases upon the initiation of similar litigation in the past. (Vol. I, pp. 131–33).

### DISCUSSION AND CONCLUSIONS OF LAW

### I. JURISDICTION AND VENUE.

Jurisdiction over the subject matter of plaintiffs' action is conferred on this court by § 39 of the Lanham Act, 15 U.S.C. § 1121, by 28 U.S.C. §§ 1331(a), 1332(a) and 1338, and by principles of pendent jurisdiction. Sections 37 and 38 of the Lanham Act, 15 U.S.C. §§ 1119 and 1120, confer subject matter jurisdiction over the counterclaims for cancellation of plaintiffs' ser-

vice marks. Jurisdiction over the parties is properly exercised, and venue in this court is appropriate under 28 U.S.C. § 1391.

## II. PLAINTIFFS' STATUTORY INFRINGEMENT CLAIM.

The owner of a registered service mark has a cause of action for service mark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), when another person uses the service mark or an imitation thereof in connection with the rendition or advertising of services in commerce, without the consent of the owner, in a manner which "is likely to cause confusion, or to cause mistake or to deceive." *Id.* Sections 34, 35 and 36 of the Lanham Act, 15 U.S.C. §§ 1116–1118, provide for an injunction against the infringing use, recovery of damages by the plaintiff, and other remedies. In order to prevail in such an action, the plaintiffs must establish that the service marks are validly registered and legally protectible, that they are owned by the plaintiffs, and that the defendant's use of the marks to identify services is likely to create confusion among consumers as to the source of the services. *See, e.g., Estate of Presley v. Russen,* 513 F.Supp. 1339, 1362 (D.N.J.1981). Service marks are defined under § 45 of the Lanham Act, 15 U.S.C. § 1127, as marks used in the sale or advertising of services to identify them as services of one person and to distinguish them from the services of others. As such, they are similar to trademarks, which perform the same functions for goods. *Id.* Actions under federal law for service mark infringement are governed by principles applicable to actions for trademark infringement, *Fotomat Corp. v. Photo Drive Thru, Inc.,* 425 F.Supp. 693, 703 (D.N.J.1977), and to actions prosecuted under the common law. *E.g., Perfectform Corp. v. Perfect Brassiere Co.,* 256 F.2d 736, 740 (3rd Cir. 1958). The court will first discuss matters related to the validity and ownership of plaintiffs' marks, and then will turn to matters related to whether confusion is likely.

### A. *Validity of the Service Marks and Plaintiffs Rights to Enforce Them*

Many of defendant's affirmative defenses, as well as its counterclaims, raise the question of whether plaintiffs and the preceding owners of the service marks procured the registrations by committing fraud on the Patent Office. These claims go to the validity of plaintiffs' marks. Plaintiffs make much of the asserted incontestibility of the marks within the meaning of § 15 of the Lanham Act, 15 U.S.C. § 1065, but that section by its very terms, and by reference to § 14(c) of the Act, 15 U.S.C. § 1064(c), provides that the exclusive right to use marks is not incontestible if registration of the marks was obtained fraudulently. Section 33(b) of the Act, 15 U.S.C. § 1115(b), is to the same effect: even a mark which is otherwise incontestible shall be subject to the defense that registration of the mark was obtained fraudulently. 15 U.S.C. § 1115(b)(1). For the reasons explained below, however, the defendant's fraud claims are without merit.

Defendant's allegations of fraud form the basis for a matter traditionally heard in equity. *Blaw-Knox Co. v. Siegerist,* 300 F.Supp. 507, 515 (E.D.Mo.1968). Where the equitable defense of fraud is not related to the plaintiffs' cause of action, the defense is not cognizable. *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.,* 221 F.Supp. 576 (E.D.Wis.1963), *aff'd,* 330 F.2d 667 (7th Cir. 1964); 2 McCarthy, *Trademarks and Unfair Competition,* § 31.-17, pp. 401–03 (1973). The conduct of the registrants insofar as it concerns restaurants and motels owned by third parties is not at issue in this case, because here we are concerned only with service marks as used in connection with hotels. Witnesses from both sides with considerable experience in the trade testified that hotels and motels are markedly different in the services they offer. (Dep. of Jacobson, p. 239; Dep. of Chastain, pp. 34, 57–58). In *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co., supra,* a false statement to the Patent Office about the use of a mark in connection with the sale of goods not in

controversy was held not to give rise to cancellation. *Id.,* 221 F.Supp. at 582. The instant controversy revolves around the use of the CAMELOT mark in relation only to hotels; any fraud on the Patent Office in the form of nondisclosure of the existence of restaurants or motels bearing the name CAMELOT would have no effect on the rights of the litigants *inter sese,* for a finding of such fraud would lead to the cancellation of plaintiffs' registrations only in connection with those services. Therefore, any evidence concerning Perrault's failure to disclose to the Patent Office information about the Camelot Bar in Philadelphia, the Camelot Inn in Detroit (which was a restaurant), the Camelot Terrace Caterers, Inc., in Brooklyn, the Camelot Coffee Shop in New York, and the Camelot Inn motel in Winfield, Kansas (Findings of Fact, ¶¶ 15, *et seq.*) is irrelevant, and does not support a finding of fraud for the purposes of this case. Because the Camelot Motor Lodge and Inn Corporation of Palm Beach, Florida, appears to have operated a motel (Findings of Fact, ¶ 19), the same must be held in regard to Perrault's alleged failure to inform the Patent Office of its existence.

Defendant also predicates its claims of fraud on the fact that plaintiffs and their predecessor Perrault stated in several documents submitted to the Patent Office that the term CAMELOT INN was first used in commerce on August 4, 1964. Defendant argues that the statement is false because the Camelot Hotel in Tulsa was not opened for business until the fall of 1965. (Findings of Fact, ¶¶ 15–17). By August, 1966, prior to the issuance of any registrations, and in response to inquiries from the Patent Office, Perrault had submitted proof of actual rendition of the relevant services in commerce. (Findings of Fact, ¶¶ 22–24). The Patent Office was then in possession of a reasonably complete summary of the early uses of the CAMELOT INN mark. The Patent Office may be presumed to have relied on all of the information given to it, to have considered the contents of the disclosures as a whole, and not to have placed undue reliance or emphasis on allegations of use of the mark on August 4, 1964. If it

did as presumed, it is impossible to see how the Patent Office could have relied on the alleged misstatement concerning first use which was in Perrault's first submission or to see how the misstatement could have been material. Because the alleged misstatements were immaterial and because the court does not infer that Perrault intended for the Patent Office to rely on them, the court must reject the claims of fraud insofar as they are based on these misstatements. *Bart Schwartz International Textiles, Ltd. v. F.T.C.,* 289 F.2d 665 (C.C.P.A.1961); *Travelodge Corp. v. Siragusa,* 228 F.Supp. 238, 243 (N.D.Ala.1964), *aff'd,* 352 F.2d 517 (5th Cir. 1965) (per curiam). Similarly, because the existence of the Camelot Motor Lodge and Inn Corporation of Palm Beach, Florida, was disclosed to the Patent Office as a result of that corporation's preexisting registration of a similar mark (Findings of Fact, ¶ 20), the Patent Office may not be said to have relied on Perrault's failure to disclose the existence of the corporation in his own application.

■ The court also rejects the fraud claims because it has found that the services offered and rendered by Perrault were advertised as early as 1965. (Findings of Fact, ¶ 9). Open and notorious use of a mark in connection with the advertising of services within a commercially reasonable time prior to the actual rendition of service does constitute a use sufficient to support the accrual of registrable and enforceable rights in that mark. *Hovnanian Enterprises, Inc. v. Covered Bridge Estates, Inc.,* 195 U.S.P.Q. 658, 662–63 (T.T.A.B.1977); *Procter & Gamble Co. v. Johnson & Johnson, Inc.,* 485 F.Supp. 1185 (S.D.N.Y.1979), *aff'd without published op.,* 636 F.2d 1203 (2nd Cir. 1980). If this court's ruling is an extension of the oft stated rule that advertising is sufficient to support rights to registration if done before the date of the application, *e.g., Hovnanian Enterprises, Inc., supra,* it is not an unprecedented one, *Travelodge Corp. v. Siragusa, supra,* 228 F. Supp. 238, 243, where there has been full disclosure to the Patent Office, where the

application was not made with the purpose of defeating the rights of others to use a mark, and where actual preparations to render the services were underway at the time of the advertising.

■ Defendant next claims that plaintiffs have abandoned their rights in the service marks because they have failed effectively to prevent third parties from using the CAMELOT mark in connection with lodging services. *See* 15 U.S.C. § 1127(b). (*See* Findings of Fact, ¶¶ 37–40). The plaintiffs' lack of a consistent effort to prevent others from using the mark, especially where most of the other uses have been commercially insignificant to plaintiffs' marketing efforts, has no bearing on the rights of the parties before the court. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 614 (7th Cir. 1965); *Bond Stores, Inc. v. Bond Stores, Inc.,* 104 F.2d 124, 125 (3rd Cir. 1969); *National Football League v. Governor of the State of Delaware,* 435 F.Supp. 1372, 1389–90 (D.Del. 1977).

■ Defendant's next defense is based on the argument that plaintiffs have lost any rights to enforce rights in their service marks because they granted Abe Hesser a "naked license" to use the marks. The court rejects this defense. Plaintiffs' efforts to control the quality of services offered under the CAMELOT mark by Hesser were sufficiently diligent that plaintiffs may not be held to have granted Hesser a naked license, and to have lost their rights thereby (Findings of Fact, ¶ 32). *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 366–68 (2nd Cir. 1958).

■ Camelot, Inc., raises two other defenses which are lacking in merit, those of laches and prior continuous use by defendant of the marks. In the absence of any prejudice to the defendant as a result of any alleged delay by plaintiffs in bringing this action, the court must reject defendant's defense of laches. (Findings of Fact, ¶ 41). Finally, Camelot, Inc., argues that it is privileged to market its hotel/casino under the CAMELOT mark because Wil-Len Corp. used the name under color of a

state registration prior to the plaintiffs' predecessor's federal registration. *See* 15 U.S.C. § 1115(b)(5). Wil-Len is claimed to be defendant's predecessor in interest of the name CAMELOT. To establish such a defense, the defendant must show that its rights to the mark were established prior to plaintiffs' registration and that there has been continuous exercise of those rights since that time. *Casual Corner Associates, Inc. v. Casual Stores of Nevada, Inc.,* 493 F.2d 709, 712 (9th Cir. 1974). Wil-Len's rendition of services under the CAMELOT mark ceased for some ten years, thereby precluding defendant's invocation of the defense. (Findings of Fact, ¶ 36).

### B. *Likelihood of Confusion*

The essential question in any service mark infringement suit is whether consumers of the services in question are likely to be confused, deceived or mistaken as to the sources of the parties' services. The question of likelihood of confusion is one which is decided in light of the commercial circumstances which may vary greatly from case to case, *Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903, 907 (3rd Cir. 1952), even among cases involving the same or similar industries. A determination of whether there is likelihood of confusion must be made on the basis of a careful inquiry into the facts. Courts have commonly considered a number of factors in determining whether confusion is likely, including the degree of similarity between the marks, the similarity in the services rendered thereunder, the extent to which the services are marketed through the same channels, the intent of the defendant in adopting and exploiting the allegedly infringing marks, the amount of care and attention likely to be exercised by consumers when purchasing the services, evidence of actual confusion in light of the extent of the marks' use, survey evidence on the likelihood of confusion, the strength or weakness of the marks in question, and any other relevant factors. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 253 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,*

589 F.2d 1225, 1229 (3rd Cir. 1978); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1366 (D.N.J.1981); *Caesar's World, Inc. v. Caesar's Palace,* 490 F.Supp. 818 (D.N.J.1980); *Procter & Gamble Co. v. Johnson & Johnson, Inc., supra,* 485 F.Supp. 1185; *Restatement of the Law of Torts* (1938), § 731. Before discussing these considerations, the court will reach some of the contentions made by the parties which do not fall strictly within the categories listed immediately above.

■ Under the Lanham Act, the court is not required to consider the fact that plaintiffs' and defendant's hotels are in different cities and that only a small portion of plaintiffs' advertising is aimed specifically at consumers in the Atlantic City area. The Lanham Act stakes out a national territory for registered marks, and nonuse of a mark in a particular area does not diminish a plaintiff's rights to prevent infringement in that area. *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 362–63 (2nd Cir. 1958). At most, this is a matter bearing on the likelihood of confusion in common law infringement actions. Additionally, the court rejects any arguments by defendant that confusion is impossible because the hotels in issue are so far from one another. Distance between hotels is in no way inconsistent with common ownership.

Plaintiffs assert that the incontestability of the mark, under 15 U.S.C. § 1065, *see* p. 441, *ante,* requires this court to indulge in a conclusive presumption that confusion is likely. The case of *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134 (3rd Cir. 1981), requires no more, however, than that the court consider the vintage of the service marks—and their resultant incontestability—as but one of the considerations in determining whether a use is an infringing one. *Id.,* at 137 n.3; *contra,* 1 McCarthy, *Trademarks and Unfair Competition,* § 11.17, p. 377 (1973). The court will so consider the matter of incontestability, and will turn to the other factors bearing on whether confusion among consumers is likely.

(1) *Similarity of marks and services offered thereunder.*

The court is satisfied that the marks are normally displayed in a way which makes them strikingly similar. The parties have almost always rendered their service marks in Gothic lettering, and have both tended to print similar drawings of knights in armor on horseback near the word CAMELOT. Of course, any further uses of medieval symbols, which are used extensively by both sides, reinforces the similarity of the impressions conveyed to consumers. Infrequently, defendant has placed a reference to the American Leisure Corp., its parent corporation, in advertisements and press releases concerning the Camelot Hotel/Casino. But this reference is not the dominant visual element in any advertisement, and is not likely to make a lasting impression on the ordinary consumer viewing the advertisement. *See Estate of Presley v. Russen,* 513 F.Supp. 1339, 1367 (D.N.J.1981). The reference, to the extent that it is used, reduces the similarity between the two marks only minimally.

Defendant has introduced much evidence concerning plaintiffs' sporadic efforts to change designations of its lodgings from CAMELOT INN to CAMELOT HOTEL. Defendant argues that either of these designations—especially the former—differs markedly from defendant's designation of its facility as the CAMELOT HOTEL/CASINO. It is implied, further, that plaintiffs have adopted the use of the designation CAMELOT HOTEL specifically for the purpose of exacerbating the similarity between plaintiffs' and defendant's marks in order to influence the outcome of this litigation. The court does not accept either contention. Any consumer confusion is not likely to be mitigated by the differences between the mark CAMELOT HOTEL on the one hand and the mark CAMELOT HOTEL/CASINO on the other, for the dominant impression is made by the word CAMELOT alone. *Estate of Presley, supra.* The court has already noted its finding that plaintiffs' efforts to change the designations of its hotels predated the instant con-

troversy, and have been carried on in good faith. (Findings of Fact, ¶ 43). The similarity of the marks is palpable, and is not a product of the plaintiffs' machinations.

The presence of a casino in the defendant's hotel does not differentiate it significantly from plaintiffs' hotels for the purpose of mitigating any consumer confusion. It is not likely to be thought of as an indication of ownership so much as it will be thought of as an indication of the fortuity of location, and the lawful availability of an ancillary service at one location which is not permitted to be offered at another. The fact remains that all of the hotels are luxury hotels which offer a full range of services to travellers who are able to pay large amounts for room accommodations. As far as the essential services offered by the parties are concerned, the hotels are similar.

### (2) *Similarities in channels of marketing.*

The court has noted that advertisements and promotional materials for the plaintiffs' and the defendant's respective Camelots have appeared in many of the same publications used by persons who make travel arrangements for others. Sales personnel for both sides will likely continue to attend the same conventions of travel agents and convention planners. (Findings of Fact, ¶¶ 42, 43). The use of similar channels of marketing does not contribute substantially to confusion where the purchasers of services who are reached through such channels are careful buyers who are capable of inquiring into and understanding information about the sources of services offered. Convention and meeting planners, who will account for about half of the business of both parties' hotels, are such sophisticated purchasers. They are conversant with commercial conditions in the lodging industry, and they will not be confused by the presence of luxury hotels bearing the same names in different cities.

Of more concern is the likelihood of confusion among individual travellers who are less sophisticated. It is difficult to predict the extent to which there will be an overlap in the channels of marketing aimed at such people, but it is safe to say that at least some individual travellers will be exposed to advertising from both parties through television commercials, magazine advertisements, and other sources. To whatever extent that is true, the gauge of confusion among these less sophisticated purchasers may be determined by the character of survey evidence on the likelihood of confusion and of evidence of incidents of actual confusion. These will be discussed below.

### (3) *Survey evidence.*

The court gives little weight to the survey evidence. A survey must duplicate to some degree the conditions which would prevail at the time of purchase. The respondents must be given at least some of the knowledge about the products in question which they would have were they actually about to make a purchasing decision. *American Luggage Works v. United States Trunk Co.,* 158 F.Supp. 50, 53–54 (D.Mass. 1957) (Wyzanski, J.), *aff'd sub nom. Hawley Products Co. v. United States Trunk Co.,* 259 F.2d 69 (1st Cir. 1958). The court has little doubt that exposure to future advertisements will make buyers aware that defendant's establishment is in Atlantic City. At least this much would be clear from most of defendant's ads, although it was not made clear to the survey respondents. (Findings of Fact, ¶¶ 49, 50). Anyone who was about to purchase the services, as well as anyone who had actually seen the billboards *in situ,* would have known that the hotel and the billboards were in Atlantic City. A key fact which would bear in the minds of persons prepared to purchase hotel services was never disclosed to the respondents. Only twenty-one percent of the respondents were able to guess that the defendant's hotel might be in Atlantic City, and these persons were never told that they were correct. (Findings of Fact, ¶ 50). It has not been argued that these twenty-one percent represent a large enough group of people to make their responses statistically significant or representative of the buying public. Accordingly, the results of the sur-

vey play little part in helping this court to determine if confusion is likely.

A further reason for the court's disregard of the survey evidence lies in the choice of the respondents, known in the jargon of statisticians as the "universe" of respondents. All of the persons sampled had been guests at the plaintiffs' hotels within about a year preceding the survey. (Findings of Fact, ¶ 48). While plaintiffs' witness presented the thesis that the universe was chosen to minimize the possibility that confusion would be found (thus increasing the reliability of any finding that there was confusion), it is quite uncertain that the choice was made correctly toward that end. It is likely that the familiarity of the respondents with the plaintiffs' hotels increased the likelihood that they would give some form of answer relating the plaintiffs' and the defendant's hotels. In view of the large advertising expenditures projected by defendant, at least some consumers of the hotel services in question will likely be familiar with both the plaintiffs' and the defendant's hotels, or perhaps with the defendant's alone. A meaningful gauge of the likelihood of confusion would allow the court to assess responses from persons who are familiar with the defendant's establishment. The choice of the universe, and the manner of questioning was such that a useful prediction of the likelihood of confusion was not presented. In *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), the court discounted results of survey where its universe consisted primarily of persons who had been exposed more to the plaintiff's product than to the defendant's. In *Zimmerman v. Holiday Inns of America, Inc.*, 266 A.2d 87, 438 Pa. 528 (1970), it was held that a survey could not be considered meaningful where it did not include the responses of persons familiar with both products. *Id.,* 266 A.2d, at 91.

(4) *Evidence of actual confusion in light of the widespread use of the CAMELOT marks.*

Plaintiffs received two letters from Kinark stockholders by which the writers questioned whether or not the defendant's Camelot Hotel/Casino was owned by the plaintiffs or connected to the plaintiffs' hotels. (Findings of Fact, ¶ 44). The court may infer that the question has crossed the minds of others who have not been moved to call or write to Kinark. It has been observed that evidence of actual confusion by some is impressive evidence of the likelihood by others, *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir. 1971); *Continental Connector v. Continental Specialities,* 492 F.Supp. 1088, 1093 (D.Conn.1979), and this is because the vast majority of persons confused about the source of a product do not make the effort to contact either of the sources of competing products.

Nevertheless, the plaintiffs have adduced no evidence as to confusion by consumers among the sources of plaintiffs' Camelot Inns and Camelot Hotels and similarly named establishments owned by others. There has been no evidence of anyone inquiring of plaintiffs about the ownership of other Camelots in spite of the existence of innumerable such establishments over many years. (Findings of Fact, ¶¶ 37–39). Perhaps it is because most consumers have an intuitive grasp of the weakness of the CAMELOT service mark, which is a matter which the court will discuss below. The dearth of evidence of confusion of this sort leads the court to infer that consumers are not often confused by the existence of the many lodgings bearing the name CAMELOT because they do not consider the mark to be an indication of ownership or source. There being evidence of only two incidents of consumer confusion, the court gives the evidence little weight.

(5) *The intent of the defendant in adopting and using the mark.*

The tendency of courts to focus on the state of mind of the defendant in adopting and exploiting the marks in controversy has been the subject of persuasive criticism. See 2 McCarthy, *Trademarks & Unfair*

*Competition,* § 25.35, pp. 112–15 (1973). Evidence on the intent of the defendant is of little value in this case because it is so ambiguous. Plaintiffs have placed some emphasis on defendant's recognition of the potential for confusion as it was evidenced by Mr. Jacobson's decision not to hire David Smart as a sales representative for Camelot, Inc., while Smart was also representing Kinark. (Findings of Fact, ¶ 45). Evidence to this effect, however, is a sword which once dislodged from its stone may be swung both ways. Had not Mr. Jacobson acted with due circumspection by rejecting the approaches of Mr. Smart, he might have been impaled on the finding that plaintiffs and defendant are using similar channels of marketing. Discretion proved to be the better part of valor for defendant, however, and Camelot, Inc., should not be held to have implied that the likelihood of confusion is great merely because it acted to minimize that likelihood.

(6) *The strength or weakness of the mark.*

There is no doubt that the number of hotels, motels, inns and other commercial establishments bearing the name CAMELOT is simply enormous. (Findings of Fact, ¶¶ 37–39). Plaintiffs argue that this fact has no bearing on whether confusion is likely. In *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609 (7th Cir. 1965), the court took an approach similar to plaintiffs':

The fact that the word "americana" is used in connection with numerous other businesses, enterprises and products is irrelevant. Uses of the name outside the hotel field could not possibly cause confusion with plaintiffs' mark. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d [149] at 154. Equally irrelevant to the question of plaintiffs' right to relief against defendant is whether other hotels or motels are also infringing the plaintiffs' name. *Metropolitan Life Ins. Co. v. Metropolitan Ins. Co.,* 277 F.2d 896, 900 (7th Cir. 1960).

*Id.,* at 614. That approach may be a useful one in cases where the mark in question is as arbitrary as the one examined in *Tisch Hotels,* where plaintiffs and defendants were both marketing hotel services under the name AMERICANA. It is not useful here.

The test of a mark's strength is the degree to which consumers will anticipate that it indicates the source of a product. It is the consumer—albeit a hypothetical one—who must be kept in mind when considering the strength or weakness of a mark:

The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although a possibly anonymous, source.... The Restatement of Torts uses the term "distinctiveness" in place of the term "strength." § 731(f) and Comment e at 602. The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded.

In an effort to liberate this aspect of trademark law from the "welter of adjectives" which had tended to obscure its contours, we recently reviewed the four categories into which terms are classified for trademark purposes. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2nd Cir. 1976). Arranged in ascending order of strength, these categories are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful....

... [W]hile these categories can be useful for analytical purposes, the strength of a mark depends ultimately on its distinctiveness, or its "origin-indicating" quality, *in the eyes of the purchasing public....*

... Trademark strength is "an amorphous concept with little shape or substance when divorced from the mark's commercial context," *E. I. DuPont de Nemours & Co. v. Yoshida Internat'l, Inc.,* [393 F.Supp. 502, 512 (E.D.N.Y.

1975)]. We see no advantage to be derived from barring judicial consideration of the realities that give content to the concept of trademark strength.

*McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131–33 (2nd Cir. 1979) (emphasis added). This explanation of the determinants of the strength or weakness of a mark does not differ substantially from the view prevailing generally in the federal courts, *see generally,* 1 McCarthy, *Trademarks and Unfair Competition,* c. 11, pp. 345–403 (1973), and is consistent with the view that the four categories indicative of strength or weakness indicate positions on a spectrum, and are not pigeonholes into which trademarks may be placed in all cases. *Union Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 366, 379 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903, 905–06 (3rd Cir. 1952).

 The court is inclined to say that the CAMELOT service mark as applied to hotels is suggestive because there is nothing in the word CAMELOT which is necessarily indicative of hotels. The term is suggestive because "it requires imagination, thought and perception to reach a conclusion as to the nature of the" services. *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968). The determination that the mark is suggestive is only the beginning of our inquiry, however, because the commercial context of the use of the mark and the way commercial usage has conditioned the minds of consumers are determinative of the degree of protection which may be given to a suggestive mark, *McGregor-Doniger Inc. v. Drizzle Inc., supra; Telechron, Inc. v. Telicon Corp., supra.*

The hotel industry, along with the restaurant industry, relies heavily on being able to imbue its services with an aura of the exotic or a flavor of the foreign. This seems so more in the cases of hotels and restaurants than in any other industry, except perhaps dolls, toys and games, where fantasy is nearly the entire stock in trade. The widespread use of the name CAMELOT in relation to lodgings is no doubt a manifestation of this fact. The operative consideration in declining to afford protection to some suggestive trademarks is the unwillingness "to risk the development of a situation in which those attempting to market their goods will find that they cannot use apt normal words or phrases in depicting or characterizing articles because of language preemptions by others." *Telechron, Inc. v. Telicon Corp., supra,* at 906. The danger of "impoverishment of the language," *id.,* of the hotel industry is an apt consideration here because there are only a small number of service marks which are capable of evoking felicitous associations with the English Dark Ages. The name KINGS CASTLE has been used, but this does not show that there are a large number of names available for that purpose. (Dep. of Jacobson, p. 65). The names of various Arthurian personages used in connection with rooms in plaintiffs' hotels seem unsuitable to be applied to entire hotels as well. Because there are so very few ways to inform the consuming public that a hotel is designed to evoke medieval English associations, it would not be in the public interest to afford service mark protection to users of the CAMELOT service mark.

The case of *El Chico, Inc. v. El Chico Cafe,* 214 F.2d 721 (5th Cir. 1954), was decided on a similar basis. The court noted the widespread use of the trade name, and the apparent ability of the name to evoke historical and geographical associations, holding that these factors precluded a finding of actionable infringement. *Id.,* at 725. The numerous hotel cases in which injunctions were granted are distinguishable because the marks there in question were neither so distinctive nor so widely used as the ones before the court. *See Tisch Hotels, Inc. v. Americana Inn, supra,* at 614 n.6, and cases there cited. More closely applicable to our own case is that of *Sun Banks of Fla. v. Sun Fed. Sav. & Loan,* 651 F.2d 311 (5th Cir. 1981), where the court found that "extensive third-party use of the word 'Sun' [was] impressive evidence that there would be *no* likelihood of confusion" between the parties. *Id.,* at 316 (emphasis in original). The word SUN was found to

be descriptive of the State of Florida, *id.,* at 316, and evocative of the "warmth and friendliness" which characterized the state. *Id.,* at 317. The court was concerned with the possibility that a single commercial entity might be able to preempt the use of a highly evocative word which figures strongly in the public imagination were it to grant the injunction sought. As in that case, this court is of the opinion that the mark should be left to the commercial world for all to use.

The *Sun Banks* and *El Chico* cases, *supra,* counsel deference to the interests of others in being able to use a mark where that mark is one of only a few which are available to call forth a particular association. The law reflects a similar consideration when the protectibility of physical features of products is in issue. In *Application of Honeywell,* 532 F.2d 180 (Cust. & Pat.App. 1976), the Court of Customs and Patent Appeals affirmed the rejection of an application for trademark registration of a round thermostat cover. The shape of the cover was found to be functional:

> There are *only so many basic shapes* in which a thermostat or its cover can be made ... namely squares, rectangles or rounds.... This is demonstrated by the widespread use over the years of round shaped control devices for appliances and similar equipment.

*Id.,* at 182 (quoting opinion of court below) (emphasis supplied). In *Zippo Manufacturing Co. v. Rogers Importers, Inc.,* 216 F.Supp. 670 (S.D.N.Y.1963) (Feinberg, J.), the defendant was permitted to copy Zippo's celebrated design for a squarish, flip-top, windproof lighter. The reasoning which supported denial of an injunction against copying of the form of the lighter's windscreen is significant for our purposes:

> [T]he record indicates from plaintiff's own witnesses that the purpose of the perforated windscreen is to provide protection for the flame against the wind while allowing sufficient air to come in to keep the flame lit, and that the holes in the windscreen are round rather than square because it is cheaper to manufacture them that way. Obviously, having

too many holes would greatly weaken the strength of the windscreen that has to serve as the lever by which the inside mechanism of the lighter is pulled out of the case for fueling; similarly, the arrangement of the holes should preferably be staggered, rather than placed directly over each other, in order not to weaken the strength of the body of the windscreen. While it is true that slits in the windscreen could be used instead of round holes, *the number of different ways* of allowing sufficient air to reach the flame for combustion purposes *by using something other than holes is very limited.* Although the holes could have been somewhat differently shaped or spaced, even here *the number of possible arrangements ... is clearly not very great.* The effect of characterizing as nonfunctional (and therefore noncopyable) these features of plaintiff's lighter (the holes and their arrangement) would be to severely limit competitive opportunities since there are so few ways of achieving the desired operating result.

*Id.,* at 695–96 (footnotes omitted, emphasis supplied).

Although the use of the word CAMELOT may not be considered functional in the sense that it is required for the successful operation of a hotel, courts have applied the doctrine of functionality in cases where the feature in question was merely decorative but was instrumental in making the object a commercial success. *E.g., Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir. 1952); *see also Restatement of the Law of Torts* (1938), § 742. In a case where the relative paucity of alternative means to convey a commercial impression is evident and where it is commercially essential that competitors be able to convey that impression, the service mark which is used to convey that impression should not be protectible. These elements are present in this case, and, along with the fact of widespread and longstanding use by other parties, they lead to the conclusion that the Camelot mark is a relatively weak one.

## C. *Summary.*

The court has stated its conclusion that the CAMELOT mark as used in connection with hotel and other lodging services is a weak one. This weakness is likely the reason that there has been so little evidence of actual confusion among consumers who might purchase hotel services without the aid of travel agents and convention planners. It also explains why a reliable survey on the likelihood of confusion among such consumers could not be brought before the court. The weakness of the mark and the relative sophistication of travel agents and convention planners, combined with the care which they exercise when they make purchases of hotel services, make it unlikely that such purchasers will be confused by the existence of Camelot Hotels in different cities owned by different entities, despite any similarities in the channels by which they are marketed. The court is not convinced that any knowledge of possible infringement by the defendant should weigh heavily in its determination of whether confusion among consumers is likely, nor should its determination that the use of the CAMELOT mark and the services offered thereunder by both parties are basically similar. The asserted incontestability of the mark does not carry great weight; commercial necessity and the fair expectations of business people are of more import.

## III. PLAINTIFFS' OTHER CLAIMS.

Because likelihood of confusion has not been established, the court will grant judgment to the defendant on plaintiffs' claims for infringement and for unfair competition under the common law. *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1362, 1372 (D.N.J.1981); *Great Atl. & Pacific Tea Co. v. A & P Trucking Corp.,* 29 N.J. 455, 149 A.2d 595 (1959). Plaintiffs have not pressed their claim based on § 43(a) of the Lanham Act.

## IV. DEFENDANT'S COUNTERCLAIMS.

Defendant's counterclaim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), appears to be based on the fact that plaintiffs have overstated the validity of their service marks by bringing the instant lawsuit and that they have misstated the origin of their knowledge of defendant's use of a similar mark. Defendant has cited no authority which supports the proposition that the initiation of a reasonably well-founded but unsuccessful infringement action provides the basis for a counterclaim under § 43(a). The availability of such a cause of action would unduly inhibit service mark owners from protecting their rights. Plaintiffs' misstatements about the origins of their knowledge of defendant's marketing activities did not seriously aggravate the unfavorable publicity previously circulated about charges brought against the defendant by the Securities and Exchange Commission. The misstatements did not visit any damages upon defendant, were not made in bad faith, and were immaterial. Defendant does not argue that immaterial misstatements can support the counterclaim advanced, and judgment for plaintiffs will be granted thereon, as well as on other counts in the counterclaim based on allegations of misstatements.

Defendant's counterclaim for malicious prosecution is dismissed because it may not be heard "until the litigation has terminated in favor of the party who asserts the malicious prosecution counterclaim." *Penwag Property Co., Inc. v. Landau,* 76 N.J. 595, 598, 388 A.2d 1265 (1978). If the action for malicious prosecution is to be heard, it must be in a separate action. *Id.*

Defendant's counterclaim for cancellation of the plaintiffs' service marks are based on the same matters which formed some of the affirmative defenses which were discussed and rejected above. For the reasons there stated, ante, the plaintiffs are granted judgment on the counterclaim insofar as cancellation is sought.

### CONCLUSION

The court will enter an appropriate order. Each side will bear its own attorneys' fees.

### ORDER

The matter having come before the court on the 16th day of March, 1982, following a trial on the merits; and

The court having considered the entire record, the proposed findings of fact and conclusions of law, and the argument of counsel; and

For the reasons stated in the court's findings of fact and conclusions of law filed this date,

It is on this 14th day of September, 1982, hereby ORDERED:

1. Judgment is entered in favor of the defendant and against the plaintiffs on the complaint and all of the counts therein;

2. The counterclaim of the defendant is dismissed without prejudice insofar as it purports to state a claim for relief for malicious prosecution;

3. Judgment is entered in favor of the plaintiffs and against the defendant on the remaining portions of the defendant's counterclaim; and

4. Each party shall bear its own counsel fees.

No costs.